1
2
3
4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   L. J., et al.,                          Case No.  13-cv-03854-JSC

              Plaintiffs,
8                                           ORDER GRANTING PLAINTIFFS'
                                            MOTION TO EXPAND THE
9       v.                                  ADMINISTRATIVE RECORD,
                                            GRANTING DEFENDANTS' MOTION
10  PITTSBURG UNIFIED SCHOOL                FOR SUMMARY JUDGMENT, AND
    DISTRICT, et al.,                       DENYING PLAINTIFFS' MOTION FOR
11                                          SUMMARY JUDGMENT
              Defendants.
12                                          Re: Dkt. Nos. 37, 39, 41

13

14          In this action Plaintiffs L.J., a fifth grade public school student, and Nashira Hudson, L.J.'s

15  mother, seek special education instruction for L.J. ("Student").  In 2012, Defendant Pittsburg

16  Unified School District ("District") concluded on two separate occasions that Student was not

17  eligible for special education.  Administrative Law Judge ("ALJ") Margaret Broussard of

18  California's Office of Administrative Hearings denied Student's request for relief from the

19  District's determination of non-eligibility.  Plaintiffs appealed the ALJ's ruling to this Court and

20  the parties have filed dueling motions for summary judgment.  (Dkt. Nos. 37, 41.)  Plaintiffs have

21  also filed a motion to expand the administrative record.  (Dkt. No. 39.)

22          After carefully considering the parties' submissions, and having had the benefit of oral

23  argument on April 17, 2014, the Court GRANTS Plaintiffs' motion to expand the administrative

24  record, GRANTS Defendants' motion for summary judgment, and DENIES Plaintiffs' motion for

25  summary judgment.

26                                    BACKGROUND

27  A.    Evidence in the Record as of the April 2013 Due Process Hearing

28          Student is currently a general education, fifth-grade student in the Pittsburg Unified School

*United States District Court*
*Northern District of California*

District who has a history of behavioral problems going back to the second grade. During his second grade year (2010-2011), Student's discipline records show 14 to 15 instances of discipline, resulting in three days of suspension. On one occasion, Student told school personnel he wanted to die. By the end of the school year, Student was referred by the District to the Lincoln Child Center ("Lincoln")[1] for counseling services to address Student's anger issues and lack of self-control. Among other things, Lincoln completed a suicide evaluation of Student. Although Student's report card from the end of the 2010-11 school year showed that Student mastered the end-of-year standards for all academic subjects, the report indicated that Student needed improvement in several behavioral areas. Student was diagnosed with ADHD at the end of the school year and began taking Adderall.

For most of his third-grade year, Student was assigned to Lisa Gonzalez in a general education class at Marina Vista Elementary School. Ms. Gonzalez had heard that Student had some behavioral problems the previous year and volunteered to have student in her class. Unfortunately, Gonzalez was unable to control Student's behavior. At some point in the beginning of the third-grade year, the District developed a behavioral support plan ("BSP")[2] for Student. Dr. Tracy Cataldе—the District-wide lead for the District's behavioral support system and coordinator of special education and psychological services—began working with Gonzalez and Student in December 2012 or January 2013. Over the course of a few months, Dr. Cataldе concluded that Gonzalez was not implementing the BSP with fidelity and Student's unruly behavior continued to escalate. The parties agree, and the ALJ found, that Student needed a consistent, well-structured environment, which Gonzalez was unable to provide.

The District developed a second BSP for Student dated March 9, 2012. The behaviors targeted in the BSP were Student's impulsivity and refusal to follow directions. The impulsive behaviors included calling out, tipping over his desk, throwing the contents of the desk on the

---

[1] Lincoln contracts with the elementary schools in the District to provide counseling services to general education students and to provide services to special education students.

[2] As the ALJ noted, "[i]n the case of a child whose behavior impedes his or her learning or that of others, a school district may develop a BSP which includes positive behavioral interventions, strategies, and supports to address that behavior. BSP's are used in the District for both general education and special education students." (AR 554.)

United States District Court
Northern District of California

floor, getting out of his seat, making noises, leaving the classroom without permission, and pushing and grabbing other students. The impulsive behavior was noted to occur daily, was moderate to severe in intensity, and lasted two to 10 minutes.  The refusal to follow rules and directions was noted to occur daily, be moderate in intensity, and last two to 10 minutes, as well.

Student's discipline record shows 16 discipline incidents from the beginning of the 2011-12 school year until the end of March 2012.  Student's behavior—which included "punch[ing] [Mrs. Gonzalez] repeatedly in the arm" (AR 366)—resulted in four suspensions for a total of 10 school days.

Sometime also in March 2012, the District proposed moving Student to Heights School where he would be enrolled in a general education behavior class.  However, as a result of a settlement agreement reached between Hudson and the District, Student was moved into a non-behavioral class at Los Medanos Elementary School with Mr. Romell Ramos on March 27, 2012. Student was given a one-on-one aide named Brian Aranio, who was assigned to work with Student as a behavioral coach in the classroom.  Also pursuant to the agreement, Dr. Sherry Burke was retained to perform an independent psychoeducational assessment and a functional analysis assessment of Student.

Student's BSP was again revised on March 26, 2012 by Dr. Catalde to include more specific and intense behavioral strategies.  Dr. Catalde spent six hours training Aranio on how to implement Student's BSP, which included a structured reward system and the use of a teaching view instead of a disciplinary view.  Ramos also met with the principal to receive training regarding the effective implementation of Student's BSP.

The parties agree, and the ALJ found, that Ramos' class was very structured.  Both Aranio and Ramos implemented the BSP with fidelity, and Student exhibited very few behavioral problems in Ramos' class.  The few incidences that did arise did not require removal from class, a referral to the office, or a suspension.  As time went on, Student played sports and socialized with other students at recess.  Ramos felt that Student was successful in his class academically and behaviorally.  Catalde, who observed Student in Ramos' class on more than 10 occasions, testified that the comparison between Student's behavior in Gonzalez's class and Ramos' class was

United States District Court
Northern District of California

3

"[n]ight and day." (Dkt. No. 61-4, 199:14.)  Catalde credited the dramatic improvement to Ramos' structured classroom and dedication to the BSP, which sought to lessen Student's attention-seeking impulsive behavior.  Catalde opined that, in contrast to Ramos, Gonzalez gave Student lots of attention and proximity when Student misbehaved.  This nurturing inadvertently reinforced Student's problematic behaviors.

Although Aranio remained in the classroom with Student for the rest of the third-grade year, at some point "[s]hortly after" Student arrived in Ramos' class, Aranio was able to "fade back" and did not need to intervene with Student as often.  (AR 558 ¶ 17.)  "At some point," Ramos took over the implementation of the BSP on his own.  (*Id.* ¶ 19.)

Student's report card from the end of the year showed that he achieved end of year mastery, or was approaching end of year mastery, in all academic areas with the exception of two of the ten number sense standards, and one of the algebra and functions standards.  For those areas, Student was making progress toward end of year mastery.  Student received a satisfactory in all areas of citizenship and social growth.

Burke completed her psychoeducational assessment of Student in early May 2012 and presented her report at the individualized educational program ("IEP") meeting on May 30, 2012.  The purpose of the IEP meeting was to determine whether Student was eligible for special education.  In creating her report, Burke met with Student twice at her office and made one school observation.  She interviewed Hudson, Ramos, and Aranio.  She also read Student's educational file, including Student's disciplinary reports.  Among other things, Student told Burke that Aranio had taught him how to stay calm and keep out of trouble.  He also told Burke that he made a lot of new friends at school.

Dr. Burke's assessment summarized that Student presents as a bright and happy child who is verbally expressive.   She stated that Student is "clearly experiencing impulsivity in the school environment" and anger management issues in the home.  (AR 459.)  She feels that Student is highly impulsive which has resulted in a negative impact on peer relationship development.  She stated that it has also negatively affected his academic progress in that he is missing direct instruction and access to core curriculum when misbehaving, although his academic achievement

4

has not been impacted.  At the hearing in front of the ALJ, Burke clarified that her comments about his misbehavior and missing instruction did not refer to Student at the time the assessment was completed but from reports of earlier behavioral incidents prior to Student's placement in Ramos' classroom.

Burke's and Catalde's opinions as of the May 30 IEP meeting were that Student was not eligible for special education.  At the ALJ hearing, Catalde explained that Student had the capacity to acquire and use the skills necessary to display appropriate school behavior.  In his experience, Student could turn his behavior around when given structure in the general education environment.  Dr. Catalde further testified that Student needs a general education teacher who runs a highly structured class that is routine-bound, a teacher who is willing to take the time and form a relationship with Student, and one who is willing to be coached and follow Student's behavior plan.

The May 30 IEP team, which included Student's parents, determined that Student did not meet the eligibility criteria for special education under specific learning disability, other health impaired, or emotional disturbance.  Right before the meeting—on either May 29 or in the early morning of May 30—Student was admitted by his parents to a psychiatric hospital.  Hudson informed the school principal of Student's hospitalization just prior to the IEP meeting.  It does not appear, however, that Student's parents informed anyone at the IEP meeting of Student's hospitalization.  It appears Student remained hospitalized for at least one week, and missed school that entire time.  (AR 397.)

While Student was out of school during the summer, he was hospitalized two more times for threats of harm to himself or others.  Student was diagnosed with a Mood Disorder, not otherwise specified, following these hospitalizations and began taking several new medications.  Hudson notified the District of these hospitalizations on August 23, 2012.  In response, the District asked Hudson to sign a new assessment plan so that Burke could reevaluate Student based on the new information.

In the fall of 2012, Student was enrolled at Willow Cove Elementary School due to District overflow issues.  Student was assigned to Mr. Aaron Hatfield's general education fourth-grade

United States District Court
Northern District of California

United States District Court
Northern District of California

1    class.  Willow Cove's principal informed Hatfield of Student's behavioral problems and told

2    Hatfield that he wanted Student placed in his class because of Hatfield's experience working with

3    behaviorally problematic students.  Although Student was given neither a behavioral aide nor a

4    BSP, Hatfield put in place an intervention plan specifically for Student.  The plan revolved around

5    allowing Student to take "short breaks" when he felt himself becoming upset.  Hatfield explained

6    that "[s]hort breaks for [Student] is whenever he feels like he's starting to lose control of himself,

7    he can just—or when he can't handle a certain situation, he'll take himself out of the situation and

8    go take a time out for a few minutes and then come back."  (Dkt. No. 61-3 at 29:16-20.)  Hatfield

9    further explained that when Student took these timeouts—which occurred "maybe four or five

10   times" between the beginning of the school year and early April 2013 (*id.* at 31:6-7)—he would

11   walk to the office with his school work.  Student would stay in the office for approximately 15 to

12   20 minutes.  Hatfield also testified that his interventions with Student were consistent with a later-

13   developed "504 plan"[3] that included placing Student in small groups and maintaining Student's

14   proximity to Hatfield.

15        On September 25, 2012, Student was suspended for two days for an incident on the

16   playground that ended with him throwing rocks at the principal, trying to hit him, and briefly

17   leaving school grounds.  He also said he was going to kill the principal.  No other behavioral

18   incidents were reported prior to the October 9, 2012 IEP meeting.

19        At the hearing before the ALJ in April 2013, Hatfield testified that he "loved having

20   [Student] in [his] room . . . he is a big part of the room."  (Dkt. No. 61-3 at 42:5-6.)  He stated that

21   Student "is really into it . . . he wants to be part of the classroom, he wants to learn."  (*Id.* at 42:3-

22   5.)  Hatfield further stated that "[Student] is just like all the other kids, I mean, he has friends, he

23   plays."  (*Id.* at 48:4-5.)  In Hatfield's opinion, Student "is growing to be a great young adult."  (*Id.*

24   at 46:23-24.)  Academically, Student was performing at grade level or above.

25        Burke conducted her second assessment of Student, which included one day of in-school

26

27   _____

28   [3] A 504 plan refers to a plan developed in accordance with the Rehabilitation Act of 1973, 28
     U.S.C. § 794, which provides for reasonable accommodations in education for children with
     disabilities.

6

United States District Court
Northern District of California

observation on September 21, 2012.  Overall, Burke found Student's behavior unremarkable.  Her testing, however, found that Student had limited insight into his past behavior problems and showed a tendency to minimize his actions.  Burke concluded that Student's behavioral problems—which she deemed are more prevalent in the home than at school—"continue[d] to be best explained by his ADHD, ODD, and the secondary social problems associated with these diagnoses."  (AR 487.)   Burke further concluded that Student "has not yet mastered strategies for dealing with his anger, nor is he able to self-soothe or deescalate when angry."  (*Id.*)  Burke found that Student was not eligible for special education under the category of emotional disturbance, the only category Burke considered.  Among other things, Burke concluded that Student's "school-based" reactions were not "out of proportion" to the circumstances Student encountered.  (*Id.* at 488.)

As part of her second assessment, Burke spoke with Anitra Clark, a licensed clinical social worker with Kaiser Permanente Child and Family Psychiatry Clinic whom Student had been seeing intermittently since his psychiatric hospitalizations.  Clark shared her concerns with Burke regarding Student's escalating behaviors at home and in her office.  She worried that Student's unpredictable behavior may continue to make Student a danger to himself and his family.  She noted that Student requires a well-structured environment.  Clark opined that Student would benefit from additional support at home and school and placement in a therapeutic program or school.  Clark, however, was unsure how Student was functioning in the school environment and did not know Student's educational needs.

The IEP team met again on October 9, 2012 to determine whether Student was eligible for special education as a student with an emotional disturbance.  Student's grandmother attended the meeting, but Hudson did not.  Burke's updated assessment was reviewed and discussed.  Although the team found that Student was not suffering from an emotional disturbance, the team noted that Student needed to develop self-soothing strategies and referred Student to Lincoln for counseling through the general education program.

**B.     The ALJ's Findings**

The issues before the ALJ included whether the District denied Student a free appropriate

7

public education ("FAPE") by failing to make him eligible for special education and related services at the May 30, 2012 and October 9, 2012 IEP team meetings. The ALJ also considered whether the District denied Student a FAPE by failing to adhere to certain procedural requirements, such as failing to provide certain comprehensive assessments and failing to include Hudson in the decision-making process.

The ALJ concluded that Student had failed to demonstrate that he qualified for special education under any category at the time of either IEP meeting. The ALJ concluded that Student failed to qualify under the category of specific learning disability ("SLD") because "[t]here was no evidence that Student had a severe discrepancy between his intellectual ability and academic achievement." (AR 564 ¶ 43.) While Student's teachers testified that Student may be able to achieve proficient or advanced scores on STAR testing, that alone was not enough to establish a severe discrepancy between achievement and ability.

Regarding eligibility under the category of other health impairment ("OHI"), the ALJ concluded that

> the uncontroverted testimony of Mr. Ramos, Mr. Aronio, and [Mr. Hatfield], who all had observed Student in the classroom environment, established that Student was no more distractible than his classmates. He could easily be redirected back to attention with general education supports that his teachers used with all students, and none of these individuals, or others who had observed Student saw him to be drowsy or otherwise exhibiting the side effects of medication that Parent described. Student did not present any evidence from anyone who observed Student in class that his ADHD or medication side effects adversely affected his educational performance.

(*Id.* at 564 ¶ 46.) The ALJ further stated that:

> [t]he evidence shows that from the time Student was placed in Mr. Ramos' class on March 27, 2012, his behavior was well within the parameters of general education students. The presence of the behavioral coach is noted and considered, but by the time of the IEP team meeting, the behavioral coach was faded back considerably, and Student was under the instructional and behavioral control of his general education teacher. Student attempts to rely upon past behaviors that were no longer occurring to support his contention that he met the criteria for OH[I]. However, eligibility is determined at the time of the assessment and IEP team meeting. The evidence established that the general education interventions had resolved Student's behavioral issues.

8

United States District Court
Northern District of California

1   (*Id.* at 575 ¶ 15.)  The ALJ also concluded that Student did not qualify under other health

2   impairment in October 2012 either since Student "did not produce evidence that either his ADHD

3   or Mood Disorder caused limited strength, vitality, alertness or a heightened alertness to

4   environmental stimuli," and that such conditions were negatively affecting his educational and

5   social progress.  (*Id.* at ¶ 16.)

6        The ALJ further found that Student was not eligible under emotional disturbance ("ED") at

7   the time of the May 30 IEP meeting.  The ALJ reasoned that Student's expressed desire to die in

8   March 2012 was made prior to his placement in Ramos' class; by the time of the IEP meeting,

9   Student was not unhappy or depressed.  Further, "[w]hile Student may have met some of these

10  criteria while in Mrs. Gonzalez['s] class, after his placement in Mr. Ramos' class and the general

11  education interventions of the BSP and the behavioral coach, Student was not exhibiting any of

12  the criteria to make him eligible as a student with ED at either the time of the assessment by Dr.

13  Burke, or at the May 30, 2012 IEP team meeting."  (*Id.* at 576 ¶ 21.)  And while Student was

14  psychiatrically hospitalized beginning May 29, 2012, "the evidence was clear that while Parent

15  informed school personnel on May 30, 2012 that Student was hospitalized, Parent never indicated

16  that Student was psychiatrically hospitalized and the District had no way of learning this

17  information at the time of the May 30, 2012 IEP team meeting."  (*Id.* at 566 ¶ 53.)

18       The ALJ's findings in regards to the October 9 IEP meeting were slightly different, though

19  the ALJ ultimately concluded that Student was not eligible for emotional disturbance at that time

20  either.  Specifically, the ALJ found that Student's "repeated hospitalizations and threats to harm

21  himself were inappropriate behavior and feelings under normal circumstances in several

22  situations."  (*Id.* at 569 ¶ 69.)  But, "Student did not meet his burden of showing that his education

23  was adversely affected as a result, or that he was in need of special education."  (*Id.*)  The ALJ

24  reasoned that "[a]ll" of the hospitalizations occurred during the summer and "Student did not miss

25  any school because of the hospitalizations" (*id.* at 577 ¶ 23); rather, he was attending school

26  regularly, doing his work, and participating in class prior to the October 9 IEP meeting.  And

27  while Student was suspended for two days for, among other things, telling the principal he wanted

28  to kill him, the ALJ concluded that Student "did not establish that this [behavior] was related to

9

1    his previous suicidal ideations and attempt(s), nor was this type of incident repeated." (*Id.*)

2    The ALJ further concluded that

3        [e]ven if Student had met the eligibility criteria for SLD, OHI or
     ED, he still would have had to prove by a preponderance of the
4        evidence that he needed specialized instruction to qualify under the
     IDEA.  Student never showed that he had a need for specialized
5        instruction of any type to benefit from his education.  The evidence
     showed that Student was accessing and succeeding in the general
6        education curriculum at the time of both the May 30 and October 9,
     2012 IEP team meetings.

7

8    (*Id.* at ¶ 24.)

9    Regarding the alleged procedural defects, the ALJ concluded that even if the District

10   violated a procedural requirement, the violation did not deny Student a FAPE since a student who

11   is not eligible for special education cannot be denied a FAPE.

12   **LEGAL STANDARD**

13   **A.      Summary Judgment Standard**

14   Summary judgment is appropriate "if the pleadings, depositions, answers to

15   interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

16   genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

17   of law." Fed. R. Civ. P. 56(c).  "A moving party without the ultimate burden of persuasion at

18   trial—usually, but not always, a defendant—has both the initial burden of production and the

19   ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins.*

20   *Co., Ltd. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102 (9th Cir. 2000).  "[T]he moving party must

21   either produce evidence negating an essential element of the nonmoving party's claim or defense

22   or show that the nonmoving party does not have enough evidence of an essential element to carry

23   its ultimate burden of persuasion at trial . . . and persuade the court that there is no genuine issue

24   of material fact." *Id.*

25   If the "moving party carries its burden of production, the nonmoving party must produce

26   evidence to support its claim or defense." *Id.* at 1103.  If the nonmoving party fails to do so, "the

27   moving party wins the motion for summary judgment." *Id.* "But if the nonmoving party

28   produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats

United States District Court
Northern District of California

10

1    the motion." *Id.*  In deciding whether there exist genuine issues of material fact, the court draws

2    all reasonable factual inferences in favor of the non-movant.  *Anderson v. Liberty Lobby Inc.*,

3    477 U.S. 242, 255 (1986).

4    **B.    The IDEA**

5           **1.    Statutory background**

6           Congress enacted the IDEA "to ensure that all children with disabilities have available to

7    them a free appropriate public education [a 'FAPE'] that emphasizes special education and related

8    services designed to meet their unique needs." 20 U.S.C. § 1400(d) (1)(A).  "The IDEA provides

9    for a cooperative process between parents and schools which culminates in the creation of an

10   [individualized educational program ("IEP")] for every disabled student." *M.M. v. Lafayette Sch.*

11   *Dist.*, 2012 WL 398773, at *5 (N.D. Cal. Feb. 7, 2012); *see also Schaffer ex rel. Schaffer v. Weast*,

12   546 U.S. 49, 53 (2005) ("The core of the [IDEA] . . . is the cooperative process that it establishes

13   between parents and schools.").  "Each IEP must include an assessment of the child's current

14   educational performance, must articulate measurable educational goals, and must specify the

15   nature of the special services that the school will provide." *Schaffer*, 546 U.S. at 53.  The IEP

16   must be "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ.*

17   *of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982).  Schools are obligated

18   to provide "a 'basic floor of opportunity' to disabled students, not a 'potential-maximizing

19   education.'" *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 947 (9th Cir. 2009) (quoting *Rowley*,

20   458 U.S. at 197 n.21, 200).

21          The Supreme Court has recognized the importance of adherence to the procedural

22   requirements of the IDEA.  *Rowley*, 458 U.S. at 206–07.  However, not all procedural violations

23   deny the child a FAPE.  *R.B., ex. rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 938

24   (9th Cir. 2007).  A child is denied a FAPE only when the procedural violation "results in the loss

25   of an educational opportunity or seriously infringes the parents' opportunity to participate in the

26   IEP formation process." *Id.* (internal quotation marks omitted).

27          **2.    Standard of review**

28          A court reviewing the decision made after an administrative due process hearing under the

11

IDEA, "shall receive the record of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  Because the district court may supplement the record below with new evidence and make its decision based on a preponderance of the evidence, judicial review in IDEA cases "differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review."  *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993).

Despite the lower standard of deference, when reviewing state administrative decisions, "courts must give due weight to judgments of educational policy."  *Id.*at 1472 (internal quotation marks and citation omitted).  "Therefore, the IDEA does not empower courts to substitute their own notions of sound educational policy for those of the school authorities which they review. How *much* deference to give state educational agencies, however, is a matter for the discretion of the courts."  *Id* (internal quotation marks and citation omitted).

The Ninth Circuit has clarified the due weight the district court should give the hearing officer's findings.  "When exercising its discretion to determine what weight to give the hearing officer's findings, one criterion we have found useful is to examine the thoroughness of those findings.  The amount of deference accorded the hearing officer's findings increases where they are thorough and careful."  *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 2001) (internal quotation marks omitted).  A hearing officer's findings are thorough and careful "when the officer participates in the questioning of witnesses and writes a decision contain[ing] a complete factual background as well as a discrete analysis supporting the ultimate conclusions."  *Napa*, 496 F.3d at 942.

## DISCUSSION

### A.    Motion to Expand the Administrative Record

Student moves to expand the administrative record to include "newly discovered" mental health records from the Lincoln Child Center ("Lincoln").  (Dkt. No. 39.)  The records comprise approximately 200 pages of treatment notes, including two comprehensive assessments.  Student

1   focuses almost exclusively on the two assessments, which were completed on July 4, 2011 and

2   February 15, 2013.  While the 2011 assessment is mostly duplicative of what is already known

3   about Student at that time—behavioral issues in the classroom, for example—the 2013 assessment

4   includes a finding that Student's ADHD symptoms "cause clinically significant impairment in his

5   social and academic functioning."  (Dkt. No. 67 at 80.)

6         IDEA mandates that, on review of an administrative decision, the district court "shall hear

7   additional evidence at the request of a party."  20 U.S.C. § 1415(i)(2)(C)(ii).  "But not all evidence

8   is 'additional evidence.'"  *E.M. ex rel. E.M. v. Pajaro Valley Unified Sch. Dist.*, 652 F.3d 999,

9   1005 (9th Cir. 2011).  For instance, "a district court need not consider evidence that simply repeats

10  or embellishes evidence taken at the administrative hearing, nor should it admit evidence that

11  changes "the character of the hearing from one of review to a trial de novo."  *Id.* (quoting *Ojai*, 4

12  F.3d at 1473).  In addition, "actions of the school systems . . . cannot be judged exclusively in

13  hindsight."  *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999) (internal quotation marks

14  omitted).  An IEP "is a snapshot, not a retrospective."  *Id.* (internal quotation marks omitted).  At

15  the same time, the Ninth Circuit has "observed that after-acquired evidence 'may shed light' on

16  the objective reasonableness of a school district's actions at the time the school district rendered

17  its decision."  *Pajaro*, 652 F.3d at 1004 (quoting *Adams*, 195 F.3d at 1149).  "The clear

18  implication of permitting some hindsight is that additional data, discovered late in the evaluation

19  process, may provide significant insight into the child's condition, and the reasonableness of the

20  school district's action, at the earlier date."  *Id.* at 1006.  Thus, "evidence that is non-cumulative,

21  relevant, and otherwise admissible constitutes 'additional evidence' that the district court 'shall'

22  consider pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii)."  *Id.* at 1004-05.

23        The District objects to the admissibility of the Lincoln records on the ground that they are

24  hearsay that does not fall within any exception.  Specifically, the District contends that the records

25  cannot qualify under the business records exception—Federal Rule of Evidence 803(6)—because

26  the records are not accompanied by a declaration from the custodian of record.  However, the

27  District does not dispute the authenticity of the Lincoln records; indeed, the District contracted

28  with Lincoln to do what the records show—to assess, evaluate, and treat Student.  Because the

United States District Court
Northern District of California

United States District Court
Northern District of California

District does not actually contest the veracity of the Lincoln records, Student's failure to obtain a declaration from a custodian of the records is not a barrier to the business records hearsay exception.[4]   Further, the District's contention that the records contain hearsay-within-hearsay is unpersuasive.  The District fails to specifically identify what assertions, admitted for their truth, are hearsay that does not fall within any exception.   The records are relevant because, while discovered "late in the evaluation process," the reports may shed light on the Student's condition when the IEPs took place.  *See Pajaro*, 652 F.3d at 1006 (reversing the district court's denial of a motion to expand the administrative record where a doctor's report from 2007 finding "a legally significant discrepancy" between ability and achievement in 2007 made it "more likely that a legally significant discrepancy was present in 2004" when the IEP occurred).  Defendants' contentions to the contrary go to the weight given to the evidence, not its relevancy.  Defendants make no argument that the records are cumulative.

The Court accordingly GRANTS Student's motion to expand the administrative record.

**B.     Motions for Summary Judgment**

To "ensure that the rights of children with disabilities and parents of such children are protected," 20 U.S.C. § 1400(d)(1)(B), *see also* 34 C.F.R. § 300.1(b), the IDEA guarantees a FAPE to children with disabilities, 20 U.S.C. § 1412(a)(1)(A), 34 C.F.R. § 300.101.  "When analyzing whether an agency provided a student a FAPE, we conduct a two-part inquiry." *Doug C. v. Hawaii Dept. of Educ.*, 720 F.3d 1038, 1043 (9th Cir. 2013).  "First, we must consider whether the State complied with the procedures set forth in the Act." *Id.* (internal quotation marks omitted).  "Second, we must determine whether the IEP is reasonably calculated to enable the child to receive educational benefits." *Id.* (internal quotation marks omitted).  "A state must meet both requirements to comply with the obligations of the IDEA." *Id.*

---

[4] Although not discussed by the parties, the Court has considered other possible bases of admission for the records—none of which is valid.  Because Lincoln is not a party, the records cannot be an admission of a party opponent under Rule 801(d)(2)(A).  And although Lincoln and the District contracted to provide mental health treatment to District students, there is no showing that Lincoln was authorized by the District to make the assertions on its behalf.  *See* Fed. R. Evid. 801(d)(2)(C).  Finally, because Lincoln was not an employee or agent of the District's—Lincoln had simply contracted with the District to provide services; thus, it is likely an independent contractor—it would not be an opposing party's statement under Rule 801(d)(2)(D).

14

United States District Court
Northern District of California

### 1.      Procedural violation of IDEA

"[A] reviewing court first considers a school district's procedural compliance [with IDEA] before reaching the IEP's substance." *Napa*, 496 F.3d at 938.  As noted above, not all procedural violations deny the child a FAPE; rather, a child is denied a FAPE only when the procedural violation "results in the loss of an educational opportunity or seriously infringes the parents' opportunity to participate in the IEP formation process." *Id.* (internal quotation marks omitted). "Parental participation in the IEP and educational placement process is critical to the organization of the IDEA." *Doug C.*, 720 F.3d at 1043 (finding that district's decision to omit parent from IEP meeting altogether in favor of meeting IEP deadline was a procedural violation that seriously infringed parental participation).  "Where a court identifies a procedural violation that denied a student a FAPE, the court need not address the second prong." *Id.*[5]

Plaintiffs contend that the District's procedural errors seriously infringed on Hudson's opportunity to participate in the IEP formation process.[6]  These alleged errors include: 1) District's failure to produce relevant documents in Lincoln's possession, and 2) District's failure to honor Hudson's request for a School Nurse's Assessment and an interview of Ms. Gonzalez.  The Court concludes that even if the District did err, Plaintiffs failed to show that any such error infringed on Hudson's opportunity to participate in the IEP process.

Under California Education Code Section 56504

> [t]he parent shall have the right and opportunity to examine all school records of his or her child and to receive copies pursuant to this section and to Section 49065 within five business days after the request is made by the parent, either orally or in writing.  The public agency shall comply with a request for school records without unnecessary delay before any meeting regarding an individualized education program or any hearing . . . and in no case more than five business days after the request is made orally or in writing.  . . . A public agency shall provide a parent, on request of the parent, a list of the types and locations of school records collected, maintained, or used by the agency.

In addition, federal regulations provide that "[e]ach participating agency must permit parents to

---

[5] The ALJ's assertion that a procedural violation is actionable only where the student has already established substantive eligibility (AR 578) is therefore incorrect.

[6] Plaintiffs do not contend that any of the alleged procedural violations resulted in the loss of an educational opportunity.

inspect and review any education records relating to their children that are collected, maintained, or used by the agency under this part." 34 C.F.R. § 300.613.  The regulations define "education record" as those records that are "(1) Directly related to a student; and (2) Maintained by an educational agency or institution *or by a party acting for the agency or institution*."[7]  34 C.F.R. § 99.3 (emphasis added).  The parties dispute whether the Lincoln documents are "school records" under Section 56504 and "education records" under the federal regulations.  The District contends that, even though it referred Student to Lincoln and paid for all his treatment with Lincoln, it was under no duty to either produce the Lincoln records or even notify Student's mother that she would have to request the documents from Lincoln itself.  Plaintiffs counter that the District, at the very least, should have informed Hudson that Lincoln was a distinct entity and that records from it would have to be requested separately.  Given that the District referred Student to Lincoln and paid for Student's treatment and evaluations—*i.e.*, Lincoln was "acting for the [District]"—the Lincoln documents are "education records" that should have been produced under 34 C.F.R. § 300.613.  Further, while there appears to be no definition for "school record" under Section 56504, nothing in that statute provides the District protection from producing documents that it caused to be created; indeed, the statute requires that the District provide to the parent "a list of the types and locations of school records collected, maintained, or used by the agency."  Cal. Ed. Code § 56504.  At the very least, the District should have informed Hudson that the Lincoln records—which the District "used" to evaluate and treat Student—resided with Lincoln and would need to be retrieved from that separate entity.  Because the District failed to do so, it also violated Section 56504.[8]

Nonetheless, Plaintiffs have failed to demonstrate that this violation seriously infringed on

---

[7] The definition also includes a number of exceptions, none of which is relevant here.
[8] The District's contention that it could not produce the Lincoln records because the records were subject to privacy statutes is unpersuasive.  Hudson provided her consent to Lincoln "to release or obtain confidential information." (Dkt. No. 67-1 (Suppl. Admin. Record) at 150, 153.)  The release was limited to "Social History," "Educational Records/School Information," and "Treatment or Client Plan." (*Id.*)  Despite Hudson's consent to the exchange of these documents, *no* documents were given to Hudson, including the treatment plans developed by Lincoln.  One of those treatment plans includes the statement that Plaintiffs deem crucial: that Student's ADHD symptoms "cause clinically significant impairment in his social and academic functioning." (*Id.* at 84.)  Moreover, District's argument ignores that it failed to tell Hudson where the documents resided and why they were not being produced.

United States District Court
Northern District of California

1    Hudson's right to participate in the IEP formation process.  While Plaintiffs' February 2012

2    request for documents should have uncovered the July 2011 comprehensive assessment, Plaintiffs

3    do not explain how this document would have affected the IEP formation process.  Nothing in the

4    July 2011 assessment is materially different from information already known about Student at the

5    time of both IEP meetings.  And although the February 2013 assessment includes possibly new

6    information—that Student's ADHD symptoms cause clinically significant impairment in his social

7    and academic functioning—there is no evidence that connects this 2013 assessment with Student's

8    condition at the time of either the May 30 or October 9 IEP meetings.  *Cf. Pajaro*, 652 F.3d at

9    1006 (remanding to district court for consideration of student's expert's testimony regarding what

10   student's achievement and ability in 2007 would say about student's achievement and ability in

11   2004 when the IEP occurred).  Moreover, nothing in the Lincoln documents addresses whether

12   Student's condition requires special education rather than remediation through general education

13   accommodations.  As discussed further below, the lack of any evidence supporting the need for

14   remedial special education is dispositive of the substantive eligibility issue.  In addition, because

15   the 2013 assessment was not created until months *after* both IEP meetings, it is unclear how the

16   District's failure to produce it could have had any effect on Hudson's "participat[ion] in the IEP

17   formation process."  *Napa*, 496 F.3d at 938.

18          Plaintiffs' reliance on *Amanda J. ex rel. Annette J. v. Clark County School District*, 267

19   F.3d 877 (9th Cir. 2001) is inapposite.  In *Amanda J.*, the Ninth Circuit found that the school

20   district's failure to produce a document identifying Amanda as possibly autistic seriously

21   infringed on her parents' right to participate in the IEP process where the parents were otherwise

22   unaware of the possible autism diagnosis.  267 F.3d at 893.  Because Plaintiffs have failed to

23   identify any material information in the Lincoln records that was unknown to them prior to either

24   IEP meeting, the holding in *Amanda J.* is inapplicable.

25          Plaintiffs next contend that Hudson's involvement in the IEP process was seriously

26   compromised because the District "ignored Parent's request for a School Nurse's Assessment and

27   Teacher Interviews."  (Dkt. No. 37 at 11.)  Plaintiffs contend that Hudson's consent to conduct

28   Burke's initial assessment was contingent on her request that the District conduct a nurse's

17

assessment and that Burke interview Gonzalez.  Plaintiffs further argue that the failure to honor this "agreement" constitutes a violation of 20 U.S.C. § 1415(b)(3)(B), which requires "[w]ritten prior notice to the parents of the child" whenever the educational agency "refuses to initiate or change . . . the identification, evaluation, or educational placement of the child."  As an initial matter, Plaintiffs fail to cite any evidence in support of their contention that any such agreement existed.  The ALJ found that "Student failed to produce a signed copy of the assessment plan with the request."  (AR 561 ¶ 31.)  While "Student did produce an assessment plan with a notation that parent wanted Mrs. Gonzalez consulted, [] it was not signed.  Student did not establish that the assessment plan with the note to gather input from Mrs. Gonzalez was, in fact, the signed assessment plan the District received."  (*Id.*)  Plaintiffs provide no reason for overturning the ALJ's finding.

Even if the District erred in not honoring Hudson's requests, the Court is not persuaded that the error seriously infringed Hudson's ability to participate in the IEP formation process.  Plaintiffs do not dispute that the District conducted several assessments other than a nurse's assessment, and that the District received the input of several teachers and District staff.  Further, the record shows that the District did not conduct a nurse's assessment because such assessments are only helpful when the school needs or is asked to administer medications at school.  (Dkt. No. 61-6 at 201:20-202:3.)   Plaintiffs did not need or ask for medications to be administered at school; thus, the undisputed facts show that a nurse's assessment was unnecessary.  Plaintiffs also fail to explain what information Gonzalez could have provided that was not already available to Burke when she was conducting her assessment.  Presumably, Plaintiffs believe that Gonzalez could have described Student's behavior so that Burke would better know the dynamics of Student's problems.  However, Burke not only testified that she reviewed Student's academic and behavioral records from his time in Gonzalez's class, but Burke also ultimately concluded that Student had a history of severe behavioral problems, including in the first half of third grade.  In other words, Burke reviewed Student's records and *agreed* with Plaintiffs that Student was doing extremely poor in Gonzalez's class.  Burke also concluded that Student's behaviors were remedied once he left Gonzalez's class and entered the more structured environment provided by Mr. Ramos.  This

18

United States District Court
Northern District of California

1  latter conclusion—however flawed—would not have differed if Burke interviewed Gonzalez

2  because it concerns Student's behavior after he left Gonzalez's class.  Since neither a nurse's

3  assessment nor an interview of Gonzalez would have provided new, material information, the

4  District's failure to conduct either activity did not seriously infringe Hudson's ability to participate

5  in the IEP formation process.

6       **2.       Substantive Eligibility**

7       Under the IDEA, all states that receive federal educational funding must establish policies

8  and procedures to ensure that "a free appropriate public education is available to all children with

9  disabilities residing in the State."  20 U.S.C. § 1412(a)(1)(A).  The statute defines "free

10  appropriate public education" for children with disabilities as "special education."  20 U.S.C. §

11  1401(9).  Plaintiff is eligible for special education and related services if he is a "child with a

12  disability," which is defined as a child

> (i) with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; *and*
>
> (ii) who, by reason thereof, needs special education and related services.

18  20 U.S.C. § 1401(3)(A) (emphasis added); 34 C.F.R. § 300.8(a)(1).  The California Education

19  Code, similar to subsection (ii), provides that a "student with exceptional needs" who is eligible

20  under Section 1401(3)(A) must have an impairment that "requires instruction and services which

21  cannot be provided with modification of the regular school program."  Cal. Educ. Code §§

22  56026(a), (b).

23       If the District erroneously failed to identify Student as eligible for special education, and

24  therefore failed to develop an appropriate IEP for Student, District has denied Student a FAPE.

25  *Dept. of Educ. v. Cari Rae S.*, 158 F. Supp. 2d 1190, 1196–97 (D. Haw. 2001).  Plaintiffs allege

26  that the ALJ erred in denying Student eligibility for special education services when the ALJ

27  concluded that Student did not fall under any category of eligibility at the time of either the May

28  or October 2012 IEP meeting.  Plaintiffs offer three grounds under which Student should have

19

1    been categorized as a child with a disability pursuant to 20 U.S.C. § 1401(3)(A)(i), and therefore

2    entitled to special education.  First, Student asserts that he has a "specific learning disability"

3    because he has ADHD and a mood disorder, and exhibits a severe discrepancy between his

4    achievement and intellectual ability.  Second, Student asserts that he has "other health

5    impairments," pursuant to 20 U.S.C. § 1401(3)(A)(i), because his disorders interfere with his

6    ability to progress academically and socially.  Finally, Student alleges that his ADHD and mood

7    disorder constitute a "serious emotional disturbance" under the statute.  Plaintiffs also argue that

8    the ALJ erred in determining that Student, even if he did have an impairment under subsection (i),

9    did not need special education services because of his impairment.

10                    **a)      Impairment**

11                          **i.      Specific learning disability**

12          A child has a specific learning disability when: 1) he has "a disorder in one or more of the

13   basic psychological processes involved in understanding or in using language, spoken or written,

14   that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do

15   mathematical calculations"; and 2) that disorder results in a "severe discrepancy between

16   intellectual ability and achievement."  34 C.F.R. § 300.8(c)(10)(I); Cal. Code. Regs. tit. 5, §

17   3030(j).  A severe discrepancy can be identified through the use of standardized tests, or by using

18   "1. Data obtained from standardized assessment instruments; 2. Information provided by the

19   parent; 3. Information provided by the pupil's present teacher; 4. Evidence of the pupil's

20   performance in the regular and/or special education classroom obtained from observations, work

21   samples, and group test scores; 5. Consideration of the pupil's age, particularly for young children;

22   and 6. Any additional relevant information."  *Id.* § 3030(j)(4)(C).  "Specific learning disability"

23   does not include "learning problems that are primarily the result of visual, hearing, or motor

24   disabilities, of mental retardation, of emotional disturbance, or of environmental, cultural, or

25   economic disadvantage."  34 C.F.R. § 300.8(c)(10)(ii);  Cal. Educ. Code § 56337(a).

26          Under the first prong for specific learning disability eligibility, the ALJ concluded that

27   Student failed to produce evidence linking his behavioral problems—which beget his learning

28   problems—to his ADHD diagnosis.  Not so.  In both of Burke's assessments, she opined that

United States District Court
Northern District of California

20

1   Student's "behavioral difficulties can be best explained by his ADHD, ODD, and the secondary

2   social problems associated with the diagnoses." (AR 460, 487.)  Further, while Burke also opined

3   that her cognitive testing showed Student had no learning disability, the ALJ rejected all of

4   Burke's cognitive testing because the District failed to establish that the testing complied with the

5   injunction in *Larry P. v. Riles*, 793 F.2d 969 (9th Cir. 1984), which enjoined California schools

6   from using standardized intelligence tests for the purpose of identifying African-American

7   students for special education.  (AR 563 ¶ 41, 574 ¶ 13.)  Thus, there is no support in the record

8   for upholding the ALJ's determination as to the first prong.

9           The ALJ's further finding that Student did not have a learning disorder at the time of the

10   IEP meetings because Student's school-related behavioral problems were ameliorated when he

11   transferred to Ramos' class raises a more fundamental issue plaguing the ALJ's opinion.  It is

12   undisputed that Student's school-related behavior improved dramatically once he was placed in

13   Ramos' class and, continuing the next year, in Hatfield's class.  But it is also undisputed that both

14   teachers had in place specific behavioral interventions for Student to keep him in check and ensure

15   his educational progress.  Student had a one-on-one aide in Ramos' class, and a BSP that guided

16   the aide's and Ramos' conduct with Student.  Even after the aide was "faded back," he remained

17   in the classroom and Ramos continued to implement the BSP.  In fourth grade, though there was

18   no longer a BSP, Hatfield had particular behavioral accommodations in place for student,

19   including allowing Student to leave the classroom whenever he got upset, keeping Student in close

20   proximity, and funneling Student into small work groups.[9]  Dr. Catalde—the District-wide lead for

21   the District's behavioral support system and coordinator of special education and psychological

22   services—also testified that Student could turn his behavior around when given structure in the

23   general education environment.  Dr. Catalde further testified that Student needs a general

24   education teacher who runs a highly structured class that is routine-bound, a teacher who is willing

25   to take the time and form a relationship with Student, and one who is willing to be coached and

26

27   ───────────────
     [9] The ALJ's opinion contains no mention of Hatfield's intervention plan for Student, which

28   Hatfield testified he implemented from the beginning of the fourth-grade year and which later
     became features of Student's 504 plan.

United States District Court
Northern District of California

United States District Court
Northern District of California

follow Student's behavior plan.  These intervention plans, BSPs, and accommodations were, of course, there for a reason: without them, Student's behavior would revert back to his indisputably severe behavior evidenced in second grade and the first part of third grade.  Viewing Student's behavior with the overlay of these interventions and accommodations obscures Student's very real psychological problems existing under the surface.

That is not to say that Student's behavior with the interventions and accommodations in place is irrelevant—it is not.  Indeed, the effect of these general education interventions is crucial—and in this case dispositive—in determining whether a student is eligible for special education.  As noted above, to qualify for special education—*i.e.*, be a "child with a disability"—a student must meet two separate requirements: 1) establish an impairment (*e.g.*, specific learning disability, other health impairment, or emotional disturbance), and 2) need for special education and related services because of the impairment; that is, the student must have an impairment that "requires instruction and services which cannot be provided with modification of the regular school program."  Cal. Educ. Code §§ 56026(a), (b).  By considering the effect of general education modifications at step one, the ALJ conflated the issues; that an impairment does not require special education instruction is a separate issue from whether an impairment exists in the first place.

Returning to the specific learning disability criteria, Plaintiffs also challenge the ALJ's conclusion that there was insufficient evidence to find that Student's disorder, if any, resulted in a severe discrepancy between intellectual ability and achievement.  Regarding Student's intellectual ability, it is undisputed that Student's cognitive abilities were at least average during the relevant time period.  It is also undisputed that just prior to being reassigned to a new teacher and receiving general education accommodations implemented with fidelity, Student's academic achievement was suffering due to his behavior and Ms. Gonzalez's inability to implement the BSP.  (*See* AR 388 (Ms. Gonzalez's written comments for Student's second trimester report card includes: "[Student's] many days out of school because of suspensions and behavior problems has led to [Student] not reaching his potential").)  The record further shows that, given general education supports in Ramos' class, Student was "well on his way to meeting grade-level standards."  (AR

United States District Court
Northern District of California

1    574 ¶ 12.)   And, as the ALJ found, Student's average academic achievement continued in

2    Hatfield's class, where, as discussed above, Student continued to receive general education

3    accommodations.   (*See* Dkt. No. 61-3 at 18:13-14 (Hatfield describing Student's performance on

4    benchmark tests in the fall of 2012 as "right around" where "most of the class was").)

5          As with the first prong of the specific learning disability analysis, the ALJ failed to take

6    into account the effect of the general education accommodations on Student's achievement; that is,

7    the ALJ implicitly concluded that the baseline for Student's achievement was his performance

8    with the accommodations in place.  As discussed above, that was error since the ALJ's analysis

9    conflates the two-step disability inquiry.  If the ameliorating effects of general education

10   accommodations were used against the student in determining impairment (step one), then

11   assessing whether special education is required to ensure a FAPE at step two would be redundant.

12   Because it is undisputed that Student's academic achievement falls below his intellectual ability

13   when general education accommodations are absent, Student has shown that there exists a severe

14   discrepancy between his intellectual ability and academic achievement.[10]  Thus, Student has

15   shown that he suffered from a specific learning disability at the time of the May 30 and October 9

16   IEP meetings.

### ii.      Other health impairment

18         Student is eligible for special education and related services pursuant to the IDEA if he has

19   an "other health impairment" and "by reason thereof [needs] special education and related

20   services."  20 U.S.C. § 1401(3)(A).  "Other health impairment" means "having limited strength,

21   vitality, or alertness, including a heightened alertness to environmental stimuli, that results in a

22   limited alertness with respect to the educational environment, that . . . [i]s due to chronic or acute

23   health problems such as . . . attention deficit disorder or attention deficit hyperactivity disorder . . .

24   and adversely affects a child's educational performance."  34 C.F.R. § 300.8(c)(9); *see also* Cal.

25   Educ. Code § 56339; Cal. Code. Regs. Tit. 5 § 3030(f).

26         The ALJ found that Student failed to produce evidence showing that "either his ADHD or

27

28   _____

[10] The District has not argued that any discrepancy is not severe.

United States District Court
Northern District of California

1  Mood Disorder caused limited strength, vitality, alertness or a heightened alertness to

2  environmental stimuli" at the time of either the May or October 2012 IEP meetings.  (AR 575 ¶

3  16.)  The ALJ further concluded that "Student attempts to rely upon past behaviors that were no

4  longer occurring to support his contention that he met the criteria for OHI."  (*Id.* at ¶ 15.)  As

5  discussed above regarding the specific learning disability classification, these findings are

6  erroneous in light of the ALJ's failure to take into account the general education accommodations

7  supporting Student's in-school behavior and academic performance at the time of the IEP

8  meetings.[11]  Contrary to the ALJ's conclusion, Student's past behaviors with no

9  accommodations—or insufficiently implemented accommodations—are relevant in determining

10  eligibility at the time of the IEP meetings because they show what Student's behavior would likely

11  involve if no accommodations were in place.  The record shows that without properly

12  implemented accommodations Student's behavior—highly impulsive, severely aggressive—would

13  revert back to what it was in Gonzalez's class.  Burke concluded that this behavior, which shows a

14  limited alertness or heightened alertness to environmental stimuli, "can be best explained by his

15  ADHD, ODD, and the secondary social problems associated with the diagnoses."  (AR 460, 487.)

16  Further, it is irrefutable that Student's ADHD and Mood Disorder adversely affected his

17  behavioral, social, and academic development at the time of the IEP meetings.  The entire purpose

18  of the general education interventions in the latter part of third grade was to reverse these adverse

19  effects.  Although scaled down, the interventions continued into fourth grade presumably because

20  there was still a need for them; that is, without the interventions, Student's behavior would

21  adversely affect his educational performance.  Student has accordingly shown that he suffered

22  from an other health impairment during the relevant time periods.

23  <center>**iii.  Emotional disturbance**</center>

24  Under federal and California regulations, a "serious emotional disturbance" requires at

25  least one of the following characteristics:

26

27  _____

28  [11] The ALJ's conflation of the two-step disability analysis is evident where she supports her finding of no "other health impairment" by reasoning that "[t]he evidence established that the general education interventions had resolved Student's behavioral issues."  (AR 575 ¶ 15.)

(A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.

(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.

(C) Inappropriate types of behavior or feelings under normal circumstances.

(D) A general pervasive mood of unhappiness or depression.

(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

34 C.F.R. § 300.7(c)(4) (2003); cf. Cal. Code Regs. tit. 5 § 3030(i).  The child must "exhibit[ ]" the characteristic(s) "[1] over a long period of time and [2] to a marked degree [3] that adversely affects a child's educational performance."  34 C.F.R. § 300.7(c)(4) (2003).

The ALJ found that there was no evidence supporting an emotional disturbance as of May 30, 2012.  Although the ALJ did find that, as of the October 2012 IEP, Student met the criteria for "inappropriate types of behavior or feelings under normal circumstances" due to Student's hospitalizations for suicidal ideation, she ultimately concluded that Student failed to show that his behavior and feelings adversely affected his educational performance given the evidence that Student was "doing well academically, behaviorally and socially."  (AR 577 ¶ 23.)

Regarding the May 30 timeframe, the ALJ reasoned that "[w]hile Student may have met some of these criteria while in Mrs. Gonzalez['s] class, after his placement in Mr. Ramos' class and the general education interventions of the BSP and the behavioral coach, Student was not exhibiting any of the criteria to make him eligible as a student with ED at either the time of the assessment by Dr. Burke, or at the May 30, 2012 IEP team meeting."  (AR 576 ¶ 21.)  This finding is erroneous.  As discussed above, the ALJ improperly assessed Student's condition with the overlay of general education accommodations, without probing into what Student's actual condition was if not given additional supports.  Further, the ALJ's factual and legal conclusions regarding Student's May 29, 2012 psychiatric hospitalization were incorrect.  While the ALJ noted Student's psychiatric hospitalization on May 29, she failed to recognize that Student was hospitalized for a week during the school year (AR 397); rather, the ALJ stated that "[a]ll of Student's hospitalizations took place over the summer months and Student did not miss any school

25

because of the hospitalizations" (AR 577 ¶ 23). Even if the ALJ recognized this fact, she appeared

to conclude that it was irrelevant since the May 30 IEP team was unaware of the hospitalization

when they met. Not so. While the District's actions cannot be judged exclusively in hindsight,

the Ninth Circuit has held that, in reviewing a school system's actions, courts may look to

evidence not known to the decisionmakers at the time. *See Pajaro*, 652 F.3d at 1006 ("The clear

implication of permitting some hindsight is that additional data, discovered late in the evaluation

process, may provide significant insight into the child's condition, and the reasonableness of the

school district's action, at the earlier date."). Student's psychiatric hospitalization the night before

the IEP meeting provides "significant insight" into Student's condition at the time of the IEP

meeting and the ALJ should have considered it, notwithstanding the IEP team's unawareness.

Student's May 29 psychiatric hospitalization, resulting in a week of missed school, affirms that

student had an emotional disturbance at the time of the May 30 IEP meeting.

While the ALJ correctly concluded that Student suffered from "inappropriate types of

behavior or feelings under normal circumstances" at the time of the October 9 IEP meeting, the

ALJ was incorrect in concluding that Student's behaviors did not adversely affect his educational

performance. Once again, the ALJ's conclusion is flawed because it fails to take into account the

general education accommodations that prevented those adverse effects from manifesting in the

school environment. Indeed, it is a testament to the structured school environment provided to

Student during the relevant time period that Student's three psychiatric hospitalizations for threats

of harm to himself or others did not translate into any severe behavior in the school environment

beyond Student's two-day suspension at the end of September 2012. The Court accordingly

concludes that Student also suffered from an emotional disturbance at the time of the October 9

IEP meeting.

> **b)** **Need for specialized instruction**

Plaintiffs, however, must still show that—at the time of the IEP meetings—Student

required specialized instruction and services which could not be provided with modification of the

regular school program. Plaintiffs have failed to do so. The ALJ concluded that, even if Student

had an impairment, "Student never showed that he had a need for specialized instruction of any

26

1   type to benefit from his education.  The evidence showed that Student was accessing and

2   succeeding in the general education curriculum at the time of both the May 30 and October 9,

3   2012 IEP team meetings."  (AR 577 ¶ 24.)  Because the ALJ's findings are thorough, careful, and

4   supported by substantial evidence, the ALJ's determination is upheld.

5           Plaintiffs' argument regarding Student's need for specialized instruction focuses on the

6   services the District provided Student to quell his unruly behavior and improve his academic

7   performance—specifically, the one-on-one behavioral aide (Mr. Aranio), and Lincoln's

8   consultation services and individual therapy.[12]  Plaintiffs contend that these services are special

9   education and therefore establish Student's need for such specialized instruction.  While the one-

10  on-one in-class aide is significant, and likely constitutes a non-general education accommodation,

11  Plaintiffs ignore the ALJ's finding that Aranio had "faded back considerably" by May 30.  (AR

12  575 ¶ 15.)  The record therefore supports the ALJ's finding that Aranio's interventions were not

13  needed because Student's behavior had improved markedly.  To be sure, Student's BSP remained

14  in place, and Ramos implemented it with fidelity.  But Ramos' conduct with Student did not go

15  beyond general education accommodations, and Student's in-school behavior remained

16  satisfactory.  In other words, even if the one-on-one aide was special education, the record

17  supports a finding that Student's behavior remained under control when subject to mere general

18  education accommodations.  The Court is therefore not persuaded that the interventions of the

19  one-on-one aide establishes that Student's impairments required specialized instruction at the time

20  of the May 30 IEP meeting.  Nor is the Court persuaded that Student's therapy with Lincoln shows

21  that Student needed specialized instruction during the relevant time period.  There is no indication

22  in the record that Student missed class because of the therapy sessions; rather, it appears that most

23  of the sessions took place one day a week during lunchtime.  Plaintiffs provide no basis to

24  conclude that this therapy, which the District makes available to all general education students,

25  constitutes special education.

26

27  _____

28  [12] At the hearing, Plaintiffs asserted that both Ramos and Hatfield provided shortened assignments and graded only work that Student completed.  However, there is no indication in the record that any of these accommodations were made.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   The Court is also not persuaded that the general education accommodations were

2   insufficient such that specialized instruction was required to ensure Student a FAPE.  The general

3   education interventions were controlling Student's in-school behavior at the time of the May 30

4   IEP meeting.  Student did not have any behavioral outbursts that required serious discipline after

5   he arrived in Ramos' class.  Student's report card from the end of the school year shows that he

6   achieved end of year mastery, or was approaching end of year mastery, in all academic areas with

7   the exception of two of the ten number sense standards, and one of the algebra and functions

8   standards.  For those areas, Student was making progress toward end of year mastery.  Student

9   received a satisfactory in all areas of citizenship and social growth.  In sum, the general education

10  accommodations provided to Student were working as of May 30, 2012 and therefore Student was

11  not a "child with a disability" as of that date.

12   Although Student's May 29 psychiatric hospitalization appears at odds with Student's

13  turnaround in the school environment at the end of third grade, that incident does not change

14  Student's eligibility for special education.  While at school, Student was behaving well socially,

15  behaviorally, and academically because of the District's provision of general education

16  accommodations.  Plaintiffs provide no authority for the proposition that a school agency must

17  provide special education support where the student is succeeding in the school environment yet

18  struggling with his behavior in the home.

19   Student's impairments continued to be eased with general education accommodations as of

20  the October 9 IEP meeting.  Hatfield testified that Student was performing at grade level or above,

21  that he "loved" having Student in his classroom, and that Student was "just like all the other kids"

22  and "is growing to be a great young adult."  (Dkt. No. 61-3 at 48:4-5, 46:23-24.)  Burke's in-

23  school observations confirmed Hatfield's descriptions.  Substantial evidence in the record supports

24  the ALJ's conclusion that Student's impairments did not require specialized instruction as of

25  October 9, 2012.

26   The Court is not persuaded that Student's negative behavior between the May and October

27  IEPs compels a different result.  Although Student was hospitalized twice over the summer for

28  threats of harm to himself or others, as with the May 29 hospitalization, Student's behavior

28

occurred outside the school environment.  And while Student had a concerning behavioral incident at school involving throwing rocks, leaving campus briefly, and threatening to kill the principal, Student was suspended for only two days and no other behavioral problems were reported prior to the October 9 IEP meeting.  The District's and ALJ's determination that the general education accommodations were nevertheless working, and that Student was best served in the general education environment, is entitled to deference.  *See Hood v. Encinitas Union School Dist.*, 486 F.3d 1099, 1110 (9th Cir. 2007) (affirming determination that student's impairments could be accommodated in the general education environment, and stating that "[d]eference to the hearing officer and the policy determination of the school district itself is appropriate").  The Court is not persuaded that a single behavioral incident compels a finding that at the time of the IEPs special education was required to accommodate Student's impairment and ensure a FAPE.

Nor is the Court persuaded that Student's behavior occurring after the relevant IEPs changes the outcome.  Plaintiffs contend that Student's behavior has worsened considerably, and that the District is currently unable to accommodate Student's needs with general education interventions.  Even if Student's condition has deteriorated, that does not change the fact that at the time of the relevant IEPs, Student was, overall, performing well socially, behaviorally, and academically.  While in some circumstances after-acquired evidence "may shed light" on the objective reasonableness of the school agency's actions, hindsight provides no such guidance in this case.  *Pajaro*, 652 F.3d at 1004 (quoting *Adams*, 195 F.3d at 1149).  That is, what is relevant is Student's behavioral and academic functioning at the time of the 2012 IEPs, which is well documented in the record; the evidence of Student's conduct after the IEPs does not reveal previously unknown misbehavior or failed test scores that occurred during the time of the 2012 IEP meetings.

## CONCLUSION

The Court is aware that this Order is unlikely to end the unfortunate dispute between the parties.  By all accounts, Student's condition is troubling and, despite best efforts on all sides, he may be backsliding.  This Court's power, however, is constrained to the particular time period of the 2012 IEPs.  If the parties are unable to come to a resolution regarding Student's educational

United States District Court
Northern District of California

placement moving forward, it must be left to another day to decide whether general education accommodations have continued to provide Student with a free appropriate public education.

Because the ALJ's conclusion that Student's impairments did not require specialized instruction at the time of either the May 30, 2012 or October 9, 2012 IEP meetings is supported by substantial evidence and entitled to deference, the District's motion for summary judgment is GRANTED.  Plaintiffs' motion for summary judgment is accordingly DENIED.

**IT IS SO ORDERED.**

Dated: May 14, 2014

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California